# CIVIL COVER SHEET

County in which action arose _____

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

The Charlton Group, Inc., a Michigan Corporation

## DEFENDANTS

Martinrea International, Inc., a Canadian corporation and Nat Rea, a Canadian citizen

**(b)** County of Residence of First Listed Plaintiff    Macomb
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    N/A
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
David H. Oermann, Berry Reynolds & Rogowski, PC, 33493 W. 14 Mile Rd., Ste. 100,
Farmington Hills, MI 48331 (248) 851-3434

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ❏ 1  U.S. Government
       Plaintiff
- ❏ 2  U.S. Government
       Defendant
- ❏ 3  Federal Question
       (U.S. Government Not a Party)
- ☒ 4  Diversity
       (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                       and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated and Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ☒ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 610 Agriculture | ❏ 422 Appeal 28 USC 158 | ❏ 400 State Reapportionment |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 362 Personal Injury - | ❏ 620 Other Food & Drug | ❏ 423 Withdrawal | ❏ 410 Antitrust |
| ❏ 130 Miller Act | ❏ 315 Airplane Product | Med. Malpractice | ❏ 625 Drug Related Seizure | 28 USC 157 | ❏ 430 Banks and Banking |
| ❏ 140 Negotiable Instrument | Liability | ❏ 365 Personal Injury - | of Property 21 USC 881 | | ❏ 450 Commerce |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & | Product Liability | ❏ 630 Liquor Laws | **PROPERTY RIGHTS** | ❏ 460 Deportation |
| & Enforcement of Judgment | Slander | ❏ 368 Asbestos Personal | ❏ 640 R.R. & Truck | ❏ 820 Copyrights | ❏ 470 Racketeer Influenced and |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' | Injury Product | ❏ 650 Airline Regs. | ❏ 830 Patent | Corrupt Organizations |
| ❏ 152 Recovery of Defaulted | Liability | Liability | ❏ 660 Occupational | ❏ 840 Trademark | ❏ 480 Consumer Credit |
| Student Loans | ❏ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ❏ 490 Cable/Sat TV |
| (Excl. Veterans) | ❏ 345 Marine Product | ❏ 370 Other Fraud | ❏ 690 Other | | ❏ 810 Selective Service |
| ❏ 153 Recovery of Overpayment | Liability | ❏ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ❏ 850 Securities/Commodities/ |
| of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 380 Other Personal | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | Exchange |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | Property Damage | Act | ❏ 862 Black Lung (923) | ❏ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ❏ 385 Property Damage | ❏ 720 Labor/Mgmt. Relations | ❏ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal | Product Liability | ❏ 730 Labor/Mgmt.Reporting | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | Injury | | & Disclosure Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ❏ 892 Economic Stabilization Act |
| ❏ 210 Land Condemnation | ❏ 441 Voting | ❏ 510 Motions to Vacate | ❏ 790 Other Labor Litigation | ❏ 870 Taxes (U.S. Plaintiff | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ❏ 442 Employment | Sentence | ❏ 791 Empl. Ret. Inc. | or Defendant) | ❏ 894 Energy Allocation Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 443 Housing/ | **Habeas Corpus:** | Security Act | ❏ 871 IRS—Third Party | ❏ 895 Freedom of Information |
| ❏ 240 Torts to Land | Accommodations | ❏ 530 General | | 26 USC 7609 | Act |
| ❏ 245 Tort Product Liability | ❏ 444 Welfare | ❏ 535 Death Penalty | **IMMIGRATION** | | ❏ 900Appeal of Fee Determination |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | ❏ 462 Naturalization Application | | Under Equal Access |
| | Employment | ❏ 550 Civil Rights | ❏ 463 Habeas Corpus - | | to Justice |
| | ❏ 446 Amer. w/Disabilities - | ❏ 555 Prison Condition | Alien Detainee | | ❏ 950 Constitutionality of |
| | Other | | ❏ 465 Other Immigration | | State Statutes |
| | ❏ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1  Original
       Proceeding
- ❏ 2  Removed from
       State Court
- ❏ 3  Remanded from
       Appellate Court
- ❏ 4  Reinstated or
       Reopened
- ❏ 5  Transferred from
       another district
       (specify)
- ❏ 6  Multidistrict
       Litigation
- ❏ 7  Appeal to District
       Judge from
       Magistrate
       Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332(a)

Brief description of cause:
Claim for commissions

## VII. REQUESTED IN
COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $ 1,750,000 annually

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes   ❏ No

## VIII. RELATED CASE(S)
IF ANY

(See instructions:)   JUDGE _____   DOCKET NUMBER _____

DATE
October 6, 2009

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*   P40524

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# PURSUANT TO LOCAL RULE 83.11

1.      Is this a case that has been previously dismissed?    ☐ Yes  ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.      Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)    ☐ Yes  ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

Notes : _____

# United States District Court
# Eastern District of Michigan



*Summons in a Civil Action and Return of Service Form*

Case Number and Judge Assignment (to be supplied by the Court)

Plaintiff(s) Name

The Charlton Group, Inc.
A Michigan corporation,

vs.

Defendant(s) Name

Martinrea International, Inc. a Canadian
corporation and Nat Rea, a Canadian citizen,

Plaintiffs attorney, address and telephone:

David H. Oermann (P36696)
Berry Reynolds & Rogowski, PC
33493 W. 14 Mile Rd., Ste. 100
Farmington Hills, MI 48331
(248) 851-3434

Name and address of defendant being served:

Martinrea International, Inc. & Nat Rea
30 Aviva Park Drive
Vaughan, Ontario L4L 9C7 or
240 Thompson Creek Blvd.
Woodbridge, Ontario L4H 1H1

## To the defendant

This summons is notification that YOU ARE BEING SUED by the above named plaintiff(s).

1.  You are required to serve upon the plaintiff's attorney, name and address above, an answer to the complaint within __30__ days after receiving this summons, or take other actions that are permitted by the Federal Rules of Civil Procedure.

2.  You must file the original and one copy of your answer within the time limits specified above with the Clerk of Court.

3.  Failure to answer or take other action permitted by the Federal Rules of Civil Procedure may result in the issuance of a judgment by default against you for the relief demanded in the complaint.

**David J. Weaver**
**Clerk of the Court**

By: _____

Deputy Clerk

_____

Date of issuance

INT-0131-MIE-REV. 12/93 06/99

# RETURN OF SERVICE

A copy of the summons and complaint has been served upon the defendant in the manner indicated below:

Name of Defendant served: _____

Date of service: _____

## Method of Service

☐   Personally served at this address: _____

_____

☐   Left copies at the defendant's usual
place of abode with (name of person): _____

At this address: _____

_____

☐   Other (please specify): _____

_____

Service fees:   Travel   $ _____   Service $ _____   Total $ _____

*I declare under the penalty of perjury that the information contained in this Return of Service is true.*

_____
Date

_____
Signature of server

_____
Server's printed name

_____
Server's address

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE CHARLTON GROUP, INC.,
*a Michigan corporation*

Civil Action No. _____

       Plaintiff,

vs

MARTINREA INTERNATIONAL, INC.,
*a Canadian corporation*

and

NAT REA,
*a Canadian citizen*

       Defendants.

_____/

**BERRY REYNOLDS & ROGOWSKI, PC**
**David H. Oermann (P36696)**
**Ronald E. Reynolds (P40524)**
**Joseph M. Rogowski, II (P51316)**
33493 W. 14 Mile Road, Suite 100
Farmington Hills, MI 48331
Telephone (248) 851-3434
Facsimile (248) 851-4743
ron@brrlawyers.com
**Attorneys for Plaintiff**

_____/

## COMPLAINT AND JURY DEMAND

Plaintiff, The Charlton Group, Inc. ("Charlton Group"), for its Complaint against

Defendants, Martinrea International, Inc. ("Martinrea") and Nat Rea ("Mr. Rea"), alleges as

follows:

## PARTIES, JURISDICTION AND VENUE

1.  Plaintiff, Charlton Group, is a citizen of Michigan, a corporation organized under the laws of Michigan with its principal place of business located at 24000 Greater Mack Avenue St. Clair Shores, Michigan 48080-1408.

2.  Defendant, Martinrea, is a citizen of Ontario, Canada, a corporation organized and existing under the laws of Canada with its principal place of business in Vaughan, Ontario, Canada.

3.  Defendant, Mr. Rea, is a citizen of Canada, Vice Chairman of Martinrea and its largest shareholder who resides in Woodbridge, Ontario, Canada.

4.  This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship and the amount in controversy, without interest and costs, exceeds $75,000.

5.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (c).

## FACTUAL BACKGROUND

6.  For thirty years, the Charlton Group has built strategic alliances and longstanding relationships in nearly all areas of the automotive industry, including top OEM's and tier suppliers.

7.  Martinrea was and is trying to aggressively gain ground on its largest competitor in Canada, Magna International ("Magna").

### General Motors

8.  It is in this context that Mr. Rea on behalf of Martinrea approached the Charlton Group in early 2008 asking for Chris Charlton's assistance in resolving a credibility and integrity

issue which Martinrea was having with General Motors' ("GM") purchasing group while simultaneously assisting Martinrea with various aspects of its dealings with Chrysler Corporation ("Chrysler").

9. Chris Charlton ("Mr. Charlton") is President of Charlton Group. Because of Mr. Charlton's relationship with some of GM's executives, especially its Group Vice President of Purchasing, Martinrea wanted Mr. Charlton to intervene at GM on Martinrea's behalf to re-establish the company's credibility at GM and put itself in a position that it could again successfully quote on GM's business. Mr. Rea promised that Martinrea would pay the Charlton Group a commission of 2% on any new business Martinrea successfully quoted at GM, if Mr. Charlton could convince GM to allow Martinrea to re-establish itself.

10. Mr. Charlton had discussions with GM on Martinrea's behalf. As a result of Mr. Charlton's intervention and having vouched for Martinrea's credibility, Martinrea was permitted to meet with GM's Group Vice President of Purchasing in an effort to re-establish itself which in turn allowed Martinrea to begin quoting new programs with an opportunity to get business.

11. After Mr. Charlton learned that Martinrea had met with GM behind his back and was again quoting new business at GM, he requested that Charlton Group be paid the promised commissions, if Martinrea was successful in obtaining any new orders. Martinrea, however, has ignored his request. Upon information and belief, Martinrea has succeeded in obtaining new business at GM as a direct result of Mr. Charlton's services on Martinrea's behalf.

12. In an apparent effort to divert attention away from GM, Mr. Rea indicated to Mr. Charlton that there were big opportunities for the Charlton Group to earn commissions by helping Martinrea at Chrysler.

**Chrysler.**

13.     Martinrea was aware of the Charlton Group's long standing relationships within Chrysler's purchasing department. During initial conversations between the Charlton Group and Martinrea, and in several follow up emails during the period of roughly May thru November 2008, Martinrea stated that, among other things, it needed the Charlton Group to help obtain a price increase from Chrysler on a Twist Axle part which Martinrea said it was losing over $1 million per month supplying to Chrysler at the then price level.

14.     In addition, Martinrea asked for Mr. Charlton's help at Chrysler to: obtain payments on certain outstanding unpaid invoices; resolve scrap metal price issues; and obtain other work at Chrysler, including the Bentler and Bundled parts business. A short time later, Martinrea also requested Mr. Charlton's services to obtain the SKD Transfer business at Chrysler.

15.     The Charlton Group agreed to provide the requested services in exchange for Martinrea's agreement to pay a commission for the production life of such business obtained by Martinrea at Chrysler.

16.     The Charlton Group requested a 2% commission on these various programs at Chrysler similar to what it had been promised regarding GM. Martinrea agreed a 1% commission would be paid, but that a higher commission could be achieved. Martinrea indicated that the final commission amount to be paid for each program would have to be negotiated in good faith dependent upon the order pricing which was achieved on a part by part basis. Indeed, on the Twist Axle program, Martinrea later said it could not afford to pay its initial promise of 2% commission and said it could only afford a 1% commission for the life of the part because of

4

the lower profit margins on the part. Mr. Rea encouraged Mr. Charlton to keep assisting Martinrea at Chrysler and promised Mr. Charlton: "don't worry, I'll take care of you, but I am not sure yet what the pricing will be on all the programs".

17.     The Charlton Group believed that since Martinrea was relying on Charlton so extensively at Chrysler that in the spirit of team play and given the large amount of business at stake, the Charlton Group would agree to accept Mr. Rea's promise to pay the Charlton Group a commission on the Bundled parts business, the Bentler business and the SKD business at Chrysler for as long as the parts were in production by Martinrea. This offer of commissions by Martinrea seemed reasonable in light of the fact that Martinrea also said it would examine the pricing it obtained from Chrysler on a program by program basis and pay a higher commission of 2%, if the corresponding part pricing was high enough to warrant such a commission.

18.     In other words, Mr. Charlton decided that since Martinrea was relying on the Charlton Group to become so heavily involved with its Chrysler relationship, he could trust that Mr. Rea and Martinrea would be honorable, and at the very least, the parties had an agreement for a minimum commission of 1% for life of the part.

19.     Indeed, as a result of Mr. Charlton's extensive work at Chrysler during this time, the Charlton Group was involved in substantially all of Martinrea's sales representation at Chrysler.

20.     Because of the Charlton Group's efforts, Martinrea is now positioned to take over Chrysler's Twin City facility which would allow Martinrea access into the lucrative business of supplying Class A surface components.

5

**Honda of America.**

21.     While observing Mr. Charlton's success at GM and Chrysler, Mr. Rea became aware of Mr. Charlton's relationship at Honda of America ("Honda"). As a result, Mr. Rea next requested that the Charlton Group help Martinrea by opening the door to Honda's purchasing department management in Ohio.

22.     While Martinrea had knowledge of Honda and some of the business opportunities which might available at Honda, Martinrea simply did not have personal contacts and existing relationships with Honda purchasing management. Such relationships were critical to enable Martinrea to gain the level of credibility and trust necessary to obtain orders at this automotive manufacturer who was particularly cautious of entering into new relationships with suppliers.

23.     In other words, Martinrea needed the Charlton Group to introduce Martinrea to the Honda purchasing managers and use Mr. Charlton's existing relationships to give Martinrea credibility and help position Martinrea's business for success at Honda. Indeed, Mr. Rea called Mr. Charlton almost daily regarding his assistance at Honda.

24.     As a result, Mr. Charlton arranged for a meeting between Martinrea and high level purchasing managers at Honda, where a particular piece of large volume business was to be discussed, called the SKD Transfer business. Mr. Rea and Mr. Charlton decided that they would travel together to Ohio to meet with Honda purchasing. This trip was made by car from the Detroit Michigan area to Honda in Ohio on December 22, 2008.

25.     During this December 2008 trip; Mr. Rea again discussed the issue of commissions with Chris Charlton—this time involving Honda. Mr. Rea stated to Mr. Charlton that Martinrea was very appreciative of the work the Charlton Group was doing and the fact that

Mr. Charlton had devoted many months at Chrysler in resolving the many outstanding issues and getting new business for Martinrea. As such, Mr. Rea indicated that a commission arrangement would now be established for Honda.

26.     On the return trip to Michigan, after a successful meeting at Honda on December 22[nd.] Mr. Rea stated to Mr. Charlton that because of his efforts in opening the door for Martinrea at Honda, just like the arrangement regarding Chrysler, Martinrea would pay the Charlton Group a minimum 1% commission for as long as any new business from Honda was manufactured by Martinrea. Mr. Rea indicated that the final determination as to the amount of the commission would depend upon profitability for the particular part. Mr. Rea stated: "keep bringing me opportunities like this [referring to the SKD program] and you are going to make a lot of money".

27.     Mr. Rea stated that a 2% commission was not possible on the SKD program because of the relatively low price; however, he reassured Mr. Charlton that the Charlton Group would receive the minimum 1% commission for life of the part as had previously been agreed to at Chrysler.

28.     Mr. Rea also reassured Mr. Charlton that this same life of part commission arrangement which would be applied to any future business at Honda and might permit a higher commission of 2%, if the part price Martinrea was able to negotiate with Honda was high enough to ensure adequate profit margins. Mr. Charlton agreed that such a commission agreement was acceptable.

## Martinrea's Success at Chrysler and Honda.

29.     As a result of the Charlton Group's efforts for Martinrea at Chrysler, Martinrea: i) has received increased pricing on the Twist Axle program; ii) has had its scrap metal pricing issues addressed; iii) has received payment on outstanding invoices; and iv) has obtained the SKD parts orders from Chrysler totaling more than $130 million per year in new business. In addition, as a result of the relationship Mr. Charlton created for Martinrea at Chrysler, Martinrea now has the opportunity to obtain Chrysler's Twin City facility which would allow Martinrea to obtain work in the lucrative Class A surface components business, further enhancing Martinrea's profitability and strategic importance in the industry.

30.     After the Charlton Group "opened the door" at Honda, Martinrea now receives over $45 million in new business from Honda.

## Martinrea refuses to pay the promised commissions.

31.     After the meeting at Honda, Mr. Charlton wrote a letter to Mr. Rea dated December 23, 2008 confirming what he and Mr. Rea had agreed to regarding commissions.

32.     Mr. Rea responded in writing to Mr. Charlton in January 2009, thanking Mr. Charlton for his December 23rd letter and his "continued support" of Martinrea.  However, Mr. Rea reneged on his representations and promises and indicated that Martinrea was only willing to pay a 1% commission "for the life of the part" on the lower volume Chrysler Twist Axle business and a 1% commission on the Bentler business at Chrysler for one year of production only.  In addition, now that Martinrea appeared to have the large volume SKD Transfer business at both Chrysler and Honda within its grasp, Mr. Rea quickly reversed his field on paying the Charlton Group any commission for the over $175 million in annual new business Martinrea had

8

obtained at both manufacturers. Instead, Mr. Rea stated in writing that "[i]t is too early to have a clear understanding of the outcome of any other portion of business, therefore we will review that on a need to basis".

33. After several months of discussions regarding new business and the Charlton Group's commissions, Mr. Charlton had a face to face meeting at Martinrea on April 1, 2009 with Mr. Rea and Martinrea's President, Nick Orlando.

34. While Mr. Rea acknowledged that Mr. Charlton had indeed provided Martinrea with the relationships at Chrysler and Honda which had allowed Martinrea to obtain all of Martinrea's new business at these companies, Mr. Orlando said Martinrea was not making any profit on the SKD Transfer business and he did not care what agreements Mr. Rea had made with the Charlton Group. Rather, Mr. Orlando stated: "Nat's [Mr. Rea] not running the company. He can't make commitments. I'm the only one who can make decisions and I never agreed to pay you [Charlton]".

35. When Mr. Charlton continued to insist on being paid the commissions promised to his company by Mr. Rea, Mr. Orlando relented and said that, if the Charlton Group could help obtain one more program at Honda which was very profitable, namely the Honda Civic Tunnel business being manufactured by its rival Magna, "then we will go back and pay you commissions on all the SKD Transfer business at Honda". Mr. Charlton indicated that he was certain he could get the Civic Tunnel program for Martinrea; however, he was unwilling to do so unless he was paid the minimum 1% commission agreed to on all the SKD Transfer work at both Chrysler and Honda. Mr. Orlando refused.

36.     Notwithstanding Mr. Orlando's claim that Martinrea was not making any profits

on the business that the Charlton Group had helped obtain for Martinrea, within three months the

price of Martinrea's stock had doubled as it began to close the gap on its larger rival, Magna.

**COUNT I**

**<u>BREACH OF CONTRACT AS TO DEFENDANT MARTINREA</u>**

37.     The Charlton Group incorporates each of the allegations set forth above as if fully

set forth herein.

38.     The Charlton Group and Martinrea reached an agreement whereby Martinrea

would pay the Charlton Group a 2% commission on any business it quoted and obtained orders

for at GM for as long as such parts were produced by Martinrea.

39.     The Charlton Group and Martinrea also reached an agreement whereby Martinrea

would pay the Charlton Group a minimum 1% commission on the Chrysler Twist Axle business,

the SKD Transfer business at Chrysler, the Bentler business at Chrysler, the Bundled parts at

Chrysler and the SKD Transfer business at Honda for as long as those parts were in production

by Martinrea.

40.     In addition, depending upon the part pricing achieved for each program,

Martinrea agreed to pay the Charlton Group up to a 2% commission, on the Bundled Parts,

Bentler and SKD business Martinrea obtained at Chrysler and the SKD business at Honda for as

long as they were being manufactured by Martinrea. The exact amount of the commission on

such business would be finalized depending upon the level of pricing and corresponding

profitability achieved by Martinrea.

41.     The Charlton Group performed and provided its services on Martinrea's behalf pursuant to this commission agreement.

42.     Martinrea has breached the commission agreement by refusing to pay any commissions to the Charlton Group on any parts with the exception of the Chrysler Twist Axle and only for one year on the Bentler Transfer work.

43.     As a consequence of Martinrea's breach of the commission agreement, the Charlton Group has been damaged.

WHEREFORE, the Charlton Group respectfully requests this Court to enter a judgment against Defendant, Martinrea, in an amount to which it is entitled, plus statutory interest and costs.

## COUNT II

## PROMISSORY ESTOPPEL AS TO DEFENDANT MARTINREA

44.     The Charlton Group incorporates each of the allegations set forth above as if fully set forth herein.

45.     This count is provided by way of alternate pleading in the event that there is a finding that no express contract between the Charlton Group and Martinrea exists regarding the payment of commissions.

46.     In several instances during 2008, Martinrea made actual, clear and definite promises that it would pay: a 2% commission on parts orders obtained from GM; a minimum 1% commission on all the business referred to above at Chrysler and Honda for as long as the parts were in production at Martinrea; a 1% life of part commission on any other future business opportunities where the Charlton Group could provide assistance at Chrysler and Honda; and a

higher 2% commission on all parts, if the part pricing Martinrea was able to negotiate with Chrysler or Honda was high enough.

47. Martinrea reasonably expected to induce action of a definite and substantial character on the part of the Charlton Group when it made such promises because Martinrea knew or should have known that its promises to pay a commission for the Charlton Group's services at GM, Chrysler and Honda was the critical factor in the Charlton Group's decision to perform services on Martinrea's behalf.

48. Martinrea induced reliance of that nature and the Charlton Group reasonably relied upon Martinrea's promises when it performed the services requested by Martinrea at GM, Chrysler and Honda.

49. After the Charlton Group performed the services requested by Martinrea, Martinrea failed to pay the commissions as promised.

50. Martinrea's promises to pay commissions must be enforced, if injustice is to be avoided, because Martinrea has already obtained and continues to obtain millions of dollars in business from GM, Chrysler and Honda and the Charlton Group has not been paid, in full, for the services performed by the Charlton Group as promised.

WHEREFORE, Plaintiff, the Charlton Group, respectfully requests that this Court enter a judgment against Defendant, Martinrea, in an amount to which it is entitled, plus statutory interest and costs.

## <u>MISREPRESENTATION AS TO ALL DEFENDANTS</u>

51.     The Charlton Group incorporates each of the allegations set forth above as if fully set forth herein.

52.     Martinrea and Mr. Rea intentionally made false representations of material facts to the Charlton Group when Mr. Rea on Martinrea's behalf falsely represented to Mr. Charlton as alleged above in 2008 that Martinrea would pay commissions, when in fact Martinrea and Mr. Rea had no intention of paying any such commissions with the exception of the lower volume Chrysler Twist Axle business.

53.     As such, Martinrea and Mr. Rea fraudulently induced the Charlton Group to provide its services at GM, Chrysler and Honda in a scheme to use Mr. Charlton's relationships with these manufacturers to gain a business advantage and obtain new orders with no intention of compensating the Charlton Group once Martinrea had achieved its objectives.

54.     Martinrea's and Mr. Rea's representations, as set forth above, were false when they were made.

55.     Martinrea and Mr. Rea knew that such representations were false when they were made or Martinrea and Mr. Rea made them recklessly, without knowing whether they were true, and without intending to perform in accordance with their representations.

56.     Martinrea and Mr. Rea intended that the Charlton Group rely on their representations, to induce the Charlton Group to provide its services and assist Martinrea in obtaining the programs described above.

57.     The Charlton Group relied on Martinrea's and Mr. Rea's false representations in providing its services as requested at GM, Chrysler and Honda.

58.     As a result of Martinrea's and Mr. Rea's fraudulent misrepresentations, the Charlton Group has suffered damages.

WHEREFORE, Plaintiff, the Charlton Group, respectfully requests that this Court enter a judgment against Defendants, Martinrea and Mr. Rea, in an amount to which it is entitled, plus statutory interest, incidental damages and costs.

**COUNT IV**

**UNJUST ENRICHMENT AS TO DEFENDANT MARTINREA**

59.     The Charlton Group incorporates each of the allegations set forth above as if fully set forth herein.

60.     In the event that the Court finds no express contract between the Charlton Group, and Martinrea for the payment of commissions, as a result of Martinrea's and Mr. Rea's misrepresentations, Martinrea has been unjustly enriched to the detriment of the Charlton Group.

61.     The Charlton Group provided all of the services requested by Martinrea by, among other things, opening the door for Martinrea at GM and Honda and assisting Martinrea in obtaining new business at Chrysler and resolving various issues at Chrysler.

62.     Martinrea subsequently failed to pay the Charlton Group the commissions as promised for business Martinrea now enjoys at GM, Chrysler and Honda.

63.     As a direct and proximate result of Martinrea's actions, Martinrea has been unjustly enriched in the amount of commissions not paid. It would be inequitable to permit Martinrea to retain such a benefit without compensating the Charlton Group.

64.     To avoid unjust enrichment, the Charlton Group should be awarded damages in the amount of commissions owed and which should be paid in the future.

WHEREFORE, the Charlton Group, respectfully requests that this Court enter a judgment against Defendant, Martinrea, in an amount to which it is entitled, plus statutory interest, incidental damages and costs.

## COUNT V

## DECLARATORY JUDGMENT AS TO DEFENDANT MARTINREA

65.     The Charlton Group incorporates each of the allegations set forth above as if fully set forth herein.

66.     Martinrea has refused to pay not only the commissions presently due the Charlton Group, but also has refused to pay any future commissions due under the parties' agreements, even though the Charlton Group has not breached any of its obligations thereunder.

67.     The Charlton Group is entitled to a declaration that it has not breached, and is currently not breaching, any provision of the parties' commission agreements.

68.     The Charlton Group is entitled to a declaration that Martinrea is obligated to perform all of its obligations and commitments to the Charlton Group under the parties' agreements regarding the payment of commissions.

69.     An actual controversy now exists between the Charlton Group and Martinrea as to the proper interpretation of the parties' commission agreements, and it is within the jurisdiction of this Court, under Fed. R. Civ. P. 57 to render a declaratory judgment as to the parties' respective rights under such agreements.

WHEREFORE, the Charlton Group, respectfully requests that this Court enter a judgment against Defendant, Martinrea, declaring Martinrea's obligation to pay commissions under their commission agreements as stated above and awarding the Charlton Group its costs.

## COUNT VI

## MICHIGAN'S SALES REPRESENTATIVE ACT, M.C.L.A. 600.2961, ET SEQ, AS TO DEFENDANT MARTINREA

70.     The Charlton Group incorporates each of the allegations set forth above as if fully set forth herein.

71.     M.C.L.A. 600.2961(4) requires that each commission due a sales representative must be paid within 45 days after the date they become due.

72.     The Act further provides, 600.2961(5),  that any principal who intentionally fails to pay commissions is liable for not only the amount of actual commissions due, but also two times each commission due or $100,000, whichever is less.

73.     Section 600.2961(6) of the Act also provides that reasonable attorney's fees and court costs should be paid to the prevailing party in any action brought under the Act.

74.     With the exception of the Chrysler Twist Axle part, Martinrea has refused to pay any commissions due under the parties' agreements for any of the business Martinrea has received from GM, Chrysler or Honda.

WHEREFORE, the Charlton Group, respectfully requests that this Court enter a judgment against Defendant, Martinrea, in an amount to which it is entitled, plus statutory interest, the statutory penalty of $100,000 for each non-payment of commissions due, costs and reasonable attorneys' fees.

16

## COUNT VII

## <u>PROCURING CAUSE AS TO DEFENDANT MARTINREA</u>

75.     The Charlton Group incorporates each of the allegations set forth above as if fully set forth herein.

76.     In acting as a sales representative on Martinrea's behalf, the Charlton Group was hired to get customers by establishing relationships for Martinrea, specifically at GM and Honda. Martinrea realized that given Mr. Charlton's industry contacts that he had the relationships necessary to provide Martinrea opportunities to obtain orders at GM and Honda.

77.     In addition, acting as a sales representative on Martinrea's behalf, the Charlton Group was hired to, among other things, get new business at Chrysler.

78.     The Charlton Group, among other things, participated in negotiations to obtain orders for specific programs at Chrysler and Honda. In addition, the Charlton Group utilized its relationships at GM and Honda to provide Martinrea with immediate credibility with purchasing management at these companies which allowed Martinrea to receive $100's of millions in new business.

79.     As a result of the Charlton Group's work, Martinrea did obtain orders from GM, Chrysler and Honda and accordingly, the Charlton Group was the procuring cause for such business.

80.     Under Michigan law, the basic principle of fair dealing prevents Martinrea from unfairly taking advantage of the benefits of the Charlton Group's services without compensation and imposes upon Martinrea liability for commissions on orders from customers the Charlton Group procured and on orders the Charlton Group procured.

81.     The Charlton Group is, therefore, entitled to commissions as the procuring cause of the customers, GM and Honda, and as the procuring cause of the orders for the SKD Transfer business, the Bentler business and the Bundled parts business at Chrysler and the SKD business at Honda for as long as Martinrea manufacturers these parts.

WHEREFORE, the Charlton Group, respectfully requests that this Court enter a judgment against Defendant, Martinrea, in an amount to which it is entitled, plus statutory interest and costs.

<h3 style="text-align:center">COUNT VIII</h3>

<h3 style="text-align:center">QUANTUM MERUIT AS TO DEFENDANT MARTINREA</h3>

82.     The Charlton Group incorporates each of the allegations set forth above as if fully set forth herein.

83.     Martinrea has accepted and enjoyed the benefit and value of the services provided by Charlton Group in connection with GM, Chrysler and Honda and, indeed has profited from these services.

84.     Martinrea is obligated to pay Charlton Group the value of the services provided in connection with each of the above manufacturers.

85.     Martinrea has failed and refused to pay Charlton Group the value of such services.

86.     Martinrea is in breach of its obligation to pay Charlton Group for such services, the value of which annually is in excess of $1,750,000 plus interest.

WHEREFORE, the Charlton Group, respectfully requests that this Court enter a judgment against Defendant, Martinrea, in an amount to which it is entitled, plus statutory interest and costs.

/s/Ronald E. Reynolds

**Berry Reynolds & Rogowski, PC**
**David H. Oermann (P36696)**
**Ronald E. Reynolds (P40524)**
33493 W. 14 Mile Road, Suite 100
Farmington Hills, MI  48331-1587
Telephone (248) 851-3434
Facsimile (248) 851-4743
ron@brrlawyers.com
**Attorneys for Plaintiff**

Dated:  October 7, 2009

## JURY DEMAND

Plaintiff, The Charlton Group, Inc., by their attorneys, Berry Reynolds & Rogowski, P.C., hereby request a trial by jury of all issues so triable in the above action.

/s/Ronald E. Reynolds

**Berry Reynolds & Rogowski, PC**
**David H. Oermann (P36696)**
**Ronald E. Reynolds (P40524)**
33493 W. 14 Mile Road, Suite 100
Farmington Hills, MI  48331-1587
Telephone (248) 851-3434
Facsimile (248) 851-4743
ron@brrlawyers.com
**Attorneys for Plaintiff**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

The Charlton Group, Inc., A Michigan corporation,

| | |
|---|---|
| Plaintiff(s), | Case No. |
| v. | Judge |
| Martinrea International, Inc., a Canadian corporation and Nat Rea, a Canadian citizen, | Magistrate Judge |
| Defendant(s). | |

_____ /

## STATEMENT OF DISCLOSURE
## OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST

Pursuant to E. D. Mich. LR 83.4, The Charlton Group, Inc. _____

makes the following disclosure: *(NOTE: A negative report, if appropriate, is required.)*

1.　　Is said corporate party a subsidiary or affiliate of a publicly owned corporation?

Yes ☐　　　No ☑

If the answer is yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party.

Parent Corporation/Affiliate Name:
Relationship with Named Party:

2.　　Is there a publicly owned corporation or its affiliate, not a party to the case, that has a substantial financial interest in the outcome of the litigation?

Yes ☐　　　No ☑

If the answer is yes, list the identity of such corporation or affiliate and the nature of the financial interest.

Parent Corporation/Affiliate Name:
Nature of Financial Interest:

Date: October 7, 2009　　　　　　　　　　s/David H. Oermann
　　　　　　　　　　　　　　　　　　　_____

　　　　　　　　　　　　　　　　　　　P36696
　　　　　　　　　　　　　　　　　　　Berry Reynolds & Rogowski, PC
　　　　　　　　　　　　　　　　　　　33493 W. 14 Mile Road, Suite 100
　　　　　　　　　　　　　　　　　　　Farmington Hills, MI  48331-1587
　　　　　　　　　　　　　　　　　　　(248) 851-3434
　　　　　　　　　　　　　　　　　　　oermann@brrlawyers.com